UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GP-NORTHLAND CENTER, LLC,

     Plaintiff,

v.

THE SHOE SHOW OF ROCKY MOUNT, INC,

     Defendant.
_____/

Case No. 08-11441

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

Plaintiff GP-Northland Center, LLC ("Northland ") filed this action to recover rent withheld by Defendant The Shoe Show of Rocky Mount, Inc. d/b/a The Shoe Dept. ("Shoe Show"). Plaintiff alleges that Defendant has wrongfully invoked a provision of the lease allowing for the withholding of rent and other charges. Defendant asserts that it has paid Plaintiff the amount owed under the lease, in light of Plaintiff having leased space to one of Defendant's competitors. This matter comes before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is GRANTED, and Defendant's motion is DENIED.

**I.    Facts**

On May 20, 2004, Plaintiff GP-Northland Center, LLC and Defendant Shoe Show executed a lease whereby Shoe Show leased space in the Northland Center Mall in Southfield, Michigan for the purposes of operating a shoe store called The Shoe Dept.

(Def.'s Mot. at 1.)  The Shoe Dept. sells men's, women's, and children's footwear and related accessories in an open display setting.  (*Id.*; Def.'s Mot., Ex. C.)  The lease includes the following provision:

> 61.  Competing Business
>
> (A). In the event Landlord leases any other premises in the Shopping Center that is used for the primary operation of a shoe store substantially similar to, and competitive with the business being operated by Tenant in Premises (hereinafter referred to as "Competition"), Tenant may, only while in operation at the Premises according to paragraph 16 of the Lease: (1) upon the opening of the Competition, and at any time thereafter, so long as the Competition is open for business, give notice to Landlord to terminate the Lease thirty (30) days after such notice and neither party shall have further obligations to the other; and in addition to (1), Tenant may also (2) continue to operate its store in the Shopping Center in accordance with all terms and conditions of the Lease, except that (a) the total rents due will be reduced by fifty percent (50%) without any adjustments or reduction in the existing breakpoint for paying percentage rent; or (b) pay four percent (4%) of gross sales monthly in arrears in lieu of total rents due, whichever is less, for such time as such Competition is open for business in the Shopping Center. Landlord agrees that for the purpose of this paragraph, the following shall not be considered Competition: (A) any specialty athletic store such as Foot Locker, Sport Shoe, Foot Action, Athlete's Foot, Finish Line, and (B) any leases for concept shoe stores who primarily sell one brand (by way of example and without limitation, Naturalizer and Florsheim).
>
> (B).  Regardless of Section A above, Landlord may maintain the existing number of shoe stores operating at the Shopping Center with a new shoe store, provided that Landlord agrees that the following shall not be permitted as replacements: (i) DSW, Shoe Carnival, Rack Room Shoes, Famous Footwear, and (ii) a "family shoe store" selling men's, women's and children's shoes, provided that Landlord may replace any existing "family shoe stores" with another family shoe store as long as the replacement is not one of the retailers listed in (i) above.

(Pl.'s Mot., Ex. A.)

In December 2004, Parade of Shoes ceased operations at the Mall, which meant that Northland had one less shoe store tenant than it did when it executed the Shoe Show lease.  (Pl.'s Mot., Ex. D.)  In the fall of 2006, Northland entered into talks with Chernin's

Shoe Outlet regarding the opening of a store at Northland. (Pl.'s Mot. at 3.) The deal sheets used during Northland's negotiations with Chernin show that Northland was aware that Section 61 of its lease with Shoe Show meant that Chernin could not be a "family shoe store," selling men's, women's, and children's shoes. (Pl.'s Mot., Ex. E, F.) On March 30, 2007, Chernin opened at the Mall pursuant to a lease with Northland, which prohibited Chernin from selling children's shoes. (Pl.'s Mot. at 4; Pl.'s Mot., Ex. G at 64-65.)

From May 2004 until September 2007, Shoe Show paid rent in accordance with the lease terms, which calculated rent as a combination of fixed monthly installments and a percentage of gross sales. (Def's Mot. at 6-7.) In May of 2007, Shoe Show requested termination of its lease with Northland, citing low sales, high occupancy costs, and the fact that the store was losing money. (Pl.'s Mot., Ex. H.)[1] Northland denied Shoe Show's request. (Pl.'s Mot., Ex. I.)

In September of 2007, Shoe Show's Asset Manager informed Northland by letter that because Chernin's Shoe Outlet had opened in the Mall on or about April 1, 2007, Shoe Show was invoking section 61 of the Lease. (Pl.'s Mot., Ex. J.) Specifically, Shoe Show informed Northland that, effective April 1, 2007, it would be paying 4% of gross sales in lieu of minimum annual rent and other charges. (*Id.*) On October 17, 2007, Northland responded, advising Shoe Show that the opening of Chernin did not violate section 61 because Chernin was a replacement store under Section 61(B), and that full rental payments were due. (Pl.'s Mot., Ex. K.) On October 22, 2007, Northland sent Shoe Show another letter through its attorneys requesting an explanation from Shoe Show as to why

---

[1] Shoe Show's request made no reference to Chernin. (Pl.'s Mot., Ex. H.)

it believed that the opening of Chernin violated Section 61 of the lease. (Pl.'s Mot., Ex. L.)

Shoe Show's General Counsel responded on October 31 that Show Shoe had the right to pay reduced rent under Section 61 because Chernin is a "shoe store substantially similar to, and competitive with" The Shoe Dept. operated by Shoe Show in the Mall. (Pl.'s Mot., Ex. M.) This letter made no reference to Northland's reliance on part B of section 61. (*Id.*) On November 12, 2007, Northland's attorneys responded that "the opening of Chernin Shoes is not a violation of Section 61 because Chernin Shoes is a permitted replacement tenant under Section 61(B), having replaced a former shoe store that existed at the time The Shoe Dept. entered into the lease." (Pl.'s Mot., Ex. N.) In a January 14, 2008 letter, Northland's attorneys specified that Chernin Shoes replaced Parade of Shoes, which leased a space in the Mall from March 28, 1994 until June 15, 2005 and noted that Chernin "is a permitted replacement because it is not a 'family shoe store' as the store does not sell children's shoes." (Pl.'s Mot., Ex. O.)

On February 11, 2008, Shoe Show responded that Chernin is not a valid replacement because, unlike Parade of Shoes, Chernin is a competitor of The Shoe Dept. under 61(A) and is large in size. (Pl.'s Mot., Ex. P.) Shoe Show added that any attempts to customize the Chernin at Northland by prohibiting the sale of children's shoes does not change the fact that it is "competitive with [Shoe Show's] operation." (*Id.*) Northland responded with a final letter dated February 22, 2008 reiterating its position that Chernin is a permitted replacement under Section 61(B), which section supercedes the provisions of Section 61(A), because it "replaced an existing shoe store," "is not one of the expressly prohibited shoes stores," and "is not a 'family shoe store' as [it] does not sell children's shoes." (Pl.'s Mot., Ex. Q.)

4

Northland filed suit on February 26, 2008 seeking recovery of unpaid rent and other charges, as well as attorneys' fees. (Pl.'s Mot. at 5, 13-14.)[2] This matter is now before the court on the parties' December 15, 2008 cross-motions for summary judgment. Northland asserts that because the opening of Chernin did not violate section 61, this Court should enter judgment in its favor for the full amount of Shoe Show's unpaid rent and other charges as well as attorneys' fees. (Pl.'s Mot. at 14.) Shoe Show contends that it rightfully invoked Section 61's rent-reduction provision. At issue are the parties' divergent interpretations of Section 61.[3]

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the

---

[2] Northland asserts that, as of December 15, 2008, Shoe Show owed $260,221.95 in unpaid rent and other charges as well as $13,291.57 in attorneys' fees and costs as of December 11, 2008. (Pl.'s Mot. at 13-14, Ex. U, V.)

[3] Chernin terminated its lease with Northland and ceased operations in the Mall in September of 2008. (Pl.'s Mot. at 4.)

5

non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Michigan Law Governing Contract Disputes

In interpreting the lease, general rules of contract interpretation apply. First, the court must determine whether the contract language at issue is ambiguous or unambiguous. Second, the court must construe the contract.

The question of whether a contract is ambiguous is a question of law for the court. *Steinmetz Elec. Contractors v. Local Union No. 58*, 517 F. Supp. 428, 432 (E.D. Mich. 1981); *Mayer v. Auto-Owners Ins. Co.*, 127 Mich. App. 23, 27, 338 N.W.2d 407, 409 (1983). Construction of a contract, whether it is ambiguous or unambiguous, also is a question of law for the court. *Petovello v. Murray*, 139 Mich. App. 639, 642, 362 N.W.2d 857, 858 (1984); *Fragner v. Am. Cmty. Mut. Ins. Co.*, 199 Mich. App. 537, 540, 502 N.W.2d 350, 352 (1993).

A contract which admits of but one interpretation is unambiguous. *Fragner*, 199 Mich. App. at 540, 502 N.W.2d at 352. By contrast, a contract provision is ambiguous if it is

capable of two or more constructions, both of which are reasonable. *Petovello*, 139 Mich. App. at 642, 362 N.W.2d at 858.

If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654, 505 N.W.2d 553, 557 (1993), without looking to extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 205 n.6, 476 N.W.2d 392, 396 n. 6 (1991). It is improper for the court to ignore the plain meaning of the contract's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989).

If the contract is ambiguous, the court must determine the intent of the parties, looking at the contract as a whole. *Auto-Owners v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431, 434 (1992). The court may look to extrinsic evidence such as custom and usage. *In Re Smith Trust*, 480 Mich. 19, 24, 745 N.W.2d 754, 758 (2008). Further, ambiguous terms are construed against the drafter. *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 46, 297 N.W. 64, 66 (1941).

**IV.     Analysis**

Shoe Show advances three alternative arguments in support of its invocation of section 61(A)'s rent-reduction provision. It contends that: (1) section 61(A)'s restriction on the opening of a new shoe store — that it not be "substantially similar to, and competitive with" The Shoe Dept.— also applies to Northland's opening of a replacement shoe store pursuant to section 61(B); (2) Chernin cannot be considered a "replacement" for Parade of Shoes under section 61(B) because Chernin was too dissimilar to Parade; and (3) the opening of Chernin violates section 61(B) because Chernin was a "family shoe store,"

7

selling men's, women's, *and children's shoes* and did not replace another family shoe store. Each argument will be addressed in turn.

### A. The Interplay Between Section 61(A) and Section 61(B)

Shoe Show contends that section 61(a)'s prohibition of the opening of shoe stores at the Mall that are "substantially similar to, and competitive with" The Shoe Dept. applies equally to the opening of replacement shoe stores pursuant to section 61(B). Shoe Show notes that section 61(A) does not limit its application to the opening of *additional*, rather than replacement stores. Under Shoe Show's interpretation of section 61, the opening of Chernin—a competitor of The Shoe Dept—violates section 61(A) and thereby permits Shoe Show to pay reduced rent.

This Court rejects this interpretation for two reasons. First, the plain and ordinary meaning of the phrase beginning section 61(B), "Regardless of Section A above," does not support Shoe Show's interpretation. *See United Rentals (North America), Inc. v. Keizer*, 202 F.Supp.2d 727, 735 (W.D. Mich. 2002) (noting that "a court should construe the contract as it is written and presume that the parties' intent is consistent with the ordinary meaning of the terms in the contract"). The ordinary meaning of the phrase indicates that *despite* the restriction placed on Northland's leasing of space to a competing store in 61(A), Northland may still maintain the existing number of shoe stores by replacing existing shoe stores as long as *certain* competitors are not permitted as replacements.

Second, adopting Shoe Show's proffered interpretation would render portions of section 61(B) mere surplusage. Shoe Show's representative admitted that the shoe stores expressly prohibited as replacements in 61(B)(i) are all "substantially similar to, and competitive with" The Shoe Dept. (Pl.'s Reply Br., Ex. 1, at 31.) If section 61(A) applies

8

to replacement stores, as Shoe Show contends, then *all* competitive shoe stores are prohibited and there would no reason for the inclusion of a list of specific prohibited competitors. Similarly, there would no reason to permit some replacement family shoe stores in 61(B)(ii) since all family shoe stores would be prohibited as competitors of The Shoe Dept. under 61(A). This Court declines to construe the lease such that sections 61(B)(i) and (ii) are rendered meaningless. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 544 (6th Cir. 2007) (noting that "contracts must be 'construed so as to give effect to every word or phrase as far as practicable'" (quoting *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467, 663 N.W.2d 447, 453 (2003))); *Cain Rest. Co. v. Carrols Corp.*, 273 Fed. App'x 430, 437 (6th Cir. 2008) (quoting *Klapp*, 468 Mich. 459, 468, 663 N.W.2d 447, 453) (noting that this Court must "avoid an interpretation that would render any part of the contract surplusage or nugatory").[4]

### B. Interpreting the Word "Replacement" in Section 61(B)

Shoe Show argues in the alternative that even if sections 61(A) and 61(B) are distinct, section 61(A), and not 61(B), applies to Northland's leasing of space to Chernin. Shoe Show contends that while Chernin is a competitor under 61(A), it does not qualify as a "replacement" shoe store under 61(B). Relying on the definition of "replace" found in *Black's Law Dictionary* 900 (6th ed. 1991) — "to supplant with . . . [an] equivalent"— Shoe Show argues that Chernin is too dissimilar to Parade of Shoes to be its replacement. Shoe Show explains that Chernin sold men's shoes, which Parade did not; Chernin sold branded

---

[4] Shoe Show's contention that the remedy portion of section 61(A) applies to 61(B), *see* Def.'s Mot., at 7, may be correct but this does not mean that the rest of section 61(A) must apply to the opening of replacement stores.

9

shoes, which Parade did not; Chernin used an open display format, which Parade did not; and Chernin occupied a much bigger space than Parade. (Def.'s Mot., at 12-13.)

The plain meaning of the word, "replacement" in section 61(B) does not require equivalence. Section 61(B) broadly permits Northland to maintain "the existing number of shoe stores operating at the Shopping Center" and to "replace an existing shoe store operating at the Shopping Center with a new shoe store." (Pl.'s Mot., Ex. A.) Parade of Shoes was an existing shoe store at the time that the lease was executed, and Northland's leasing of space to Chernin did not increase the number of shoe stores at the Mall from the number in existence when the lease was executed. (Pl.'s Mot., Ex. D.) Section 61(B) includes no requirement that the replacement shoe store share certain characteristics with the store it replaces, and this Court declines to read such a requirement into the lease. Moreover, the fact that section 61(B)(i) and (ii) include some limitations on what shoe stores are "permitted as replacements" shows that the parties contemplated restrictions on what might constitute a valid replacement but did not include a requirement of equivalence. Similarly, the deletion of a size restriction on replacement family shoes stores in the final draft of the lease underscores the parties' choice not to restrict replacement shoe stores in this manner. (*See* Pl.'s Mot., Ex. A.)[5]

### C. Alleged Breach of Section 61(B)

---

[5] Shoe Show bemoans the fact that under this interpretation of the lease, Northland could remove shoe stores that are not competitive with The Shoe Dept. and replace them with competitive stores "by characterizing the new tenants as 'replacements.'" (Def.'s Reply Br., at 1.) The lease's inclusion of the restriction that family shoe stores may only replace other family shoe stores shows that the parties *could have* included a comparable restriction that competitors of The Shoe Dept. may only replace other competitors. (*See* section 61(B)(ii).) This provision, however, is decidedly absent.

Shoe Show also contends that even if sections 61(A) and 61(B) are distinct, and even if it is section 61(B) that applies to the replacement of Parade with Chernin, Northland's leasing of space to Chernin violated section 61(B)'s prohibition on the leasing of space to a "family shoe store," not replacing another "family shoe store." (Pl.'s Mot., Ex. A.) A family shoe store is defined by the lease as one that sells men's, women's, and children's shoes. (*Id.*) As proof of the alleged breach, Shoe Show submits the deposition testimony of its representative John Manning who testified that he sent Rich Diegel, a Shoe Show employee, to Chernin sometime after the commencement of litigation — probably July 2008 or later — and Diegel reported back to Manning that he found one shoe style being sold at Chernin in a boy's size four. (Pl.'s Mot., Ex. C, at 60-62, 69-70, 76.)[6]

That Chernin may have sold one style of shoes in a children's size did not render it a "family shoe store," and, as such, did not warrant Shoe Show's rent reduction. Northland prohibited Chernin, as a condition of its lease, from selling children's shoes and asserts that it had no knowledge that Chernin had sold this one style in a children's size. Northland submits the declaration of the manager of the Mall, Jakki Grant, who testifies that he never observed Chernin selling children's shoes; that Chernin was not marketed by the Mall as selling children's shoes; that he never observed Chernin marketing itself within the Mall as a children's or family shoe store; that if he had been informed by anyone that Chernin was

---

[6] There is some disagreement among the parties regarding what constitutes selling children's shoes. Northland contends that "children's shoes" in the lease must refer to children's shoe *sizes*, while Shoe Show interprets the term more broadly to encompass any selling of shoes to children, regardless of shoe size. (Pl.'s Mot, at 11-13.) Northland's interpretation of the lease comports with the plain meaning of the term, "children's shoes." For this reason, what is at issue in assessing the alleged breach is only Chernin's alleged stocking of one style of shoes in a children's size sometime after July 2008.

selling children's shoes, he would have "taken action to stop such sales because Chernin was not allowed to sell children's shoes under its lease with Northland Center"; and that he was never informed by Shoe Show or anyone else that Chernin was selling children's shoes. (Pl.'s Mot., Ex. R.)

The Mall directory displayed on Northland's website listed Chernin under the categories of "men's shoes" and "women's shoes," but not under "children's shoes" or "family shoe stores." (Pl.'s Mot., Ex. S.) Shoe Show never mentioned in any of its correspondence with Northland that Chernin's selling of children's shoes was a reason for Shoe Show's invocation of section 61(A)'s rent-reduction provision, and never disputed Northland's assertion in its letters that Chernin did not sell children's shoes. (*See, e.g.*, Pl.'s Mot., Ex. O, P.) In fact, Show Show did not learn of Chernin's selling of one style of children's shoes until many months after the commencement of this litigation. (Pl.'s Mot., Ex. C, at 60-62, 69-70, 76.)[7] Shoe Show has not demonstrated breach.

Moreover, even if Chernin's selling of this shoe style constituted a breach of the lease, Shoe Show has failed to present any admissible evidence of the occurrence. Shoe Show's sole evidence that Chernin sold one style of children's shoes is hearsay: Mr. Manning testifies to what Mr. Diegel reported to him, and Shoe Show has submitted no testimony or declaration from Mr. Diegel. (Pl.'s Mot., Ex. C, at 60-62, 69-70, 76.) For this reason, Shoe Show has presented insufficient evidence of breach either to support its motion for summary judgment or to create a genuine issue of material fact regarding breach to defeat

---

[7] By the time Mr. Manning mentioned Shoe Show's discovery of Chernin's sale of one style of children's shoes in his December 2008 deposition, Chernin's store at the Mall had been closed for more than two months.

Northland's motion. *See Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) (noting that hearsay evidence may not be considered on a motion for summary judgment); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (nonmoving party's inadmissible hearsay insufficient to defeat summary judgment because "'[e]vidence submitted in opposition to a motion for summary judgment must be admissible'" and "'Hearsay evidence . . . must be disregarded'" (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997))).

### IV.  Damages

Northland is entitled to past unpaid rent and charges, as well as reasonable attorney fees. (*See* Pl.'s Mot, Ex. U.)  While Northland is entitled to reasonable attorneys' fees under the lease, *see* Pl.'s Mot., Ex. B, at ¶ 34, it has submitted incomplete documentation. The Court requires information regarding the hourly rate charged as well as an itemization of hours expended and costs incurred: the sum total attached as Exhibit V to Plaintiff's motion is insufficient for the Court to assess reasonableness.  Further, the Declaration accompanying Exhibit V identifies a declarant whose name does not match that of the document's title or signature line.  Northland must submit additional documentation before this Court will consider its request for an award of attorneys' fees.  Plaintiff must submit this additional documentation within 30 days.

### V.  Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED.

    s/Nancy G. Edmunds
    Nancy G. Edmunds
    United States District Judge

Dated: April 30, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 30, 2009, by electronic and/or ordinary mail.

    s/Carol A. Hemeyer
    Case Manager